AO108(2/90) Application for Seizure Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

One suitcase and all of its contents, including approximately $100,042.00 in U.S. currency, now in the custody of the U.S. Bureau of Engraving and Printing in a vault in Washington, D.C.

**APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT**

CASE NUMBER:

I, _____Michael Riedemann_____ being duly sworn depose and say:

I am a(n)  Special Agent with the U.S. Department of Homeland Security   and have reason to believe that within the jurisdiction of this Court there is now certain property that is subject to forfeiture to the United States, namely  (describe the property to be seized)

> One suitcase and all of its contents, including approximately $100,042.00 in U.S. currency, now in the custody of the U.S. Bureau of Engraving and Printing in a vault in Washington, D.C.

which is/are: (state one or more bases for seizure under the United States Code)

(1) articles, devices, and other things possessed or used in violation of 18 U.S.C. §§ 471, 472, or 473, and subject to forfeiture, pursuant to 18 U.S.C. § 492; and/or (2) property that was involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2), or are property traceable to such a transaction, as a monetary instrument or funds transported, transmitted, or transferred from a place outside the United States to a place inside the United States with the intent to promote violations of 18 U.S.C. § 471, 472, or 473, and are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A).

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN.

Continued on the attached sheet and made a part hereof.    ☒ YES   ☐ NO

Barry Wiegand
Asset Forfeiture Unit, Criminal Division
(202) 307-0299

Signature of Affiant
Michael Riedemann, Special Agent
U.S. Department of Homeland Security

Sworn to before me, and subscribed in my presence

_____
Date

at Washington, D.C.

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CIVIL SEIZURE WARRANT

I, Michael Riedemann, am a special agent of the United States Secret Service, a unit of the Department of Homeland Security. After being duly sworn, I do hereby depose, aver, and state:

### I. SUMMARY.

1.   I submit this affidavit in an application for a warrant to seize specific items, consisting of a suitcase and its contents, which originally was claimed to be $100,000 in mutilated U.S. currency, comprising almost 15,600 individual bills.  A Japanese national who identified himself as Shohikari Itataku presented the suitcase and currency on October 3, 2006, to a U.S. government agency, the Treasury Department's Bureau of Engraving and Printing (BEP).   In doing so, Mr. Itataku claimed that the mutilated currency should be redeemed by the U.S. government exchanging it for fresh, new funds.

2.   In making his redemption claim, Mr. Itataku said that the currency in the suitcase had become mutilated by being buried in the ground for a period of time.  When BEP currency examination specialists inspected the currency, however, they found that the condition of some of the notes indicated that Mr. Itataku's explanation of buried currency was false.  Further, some of the notes in the suitcase showed signs of having been bleached, worn, ripped, or otherwise damaged deliberately to make it falsely appear that they became mutilated by being buried in the ground, when they had not.  In short, special examination and scientific testing gives evidence that at least some of the U.S. cash notes in the suitcase had been altered to make a false or fraudulent claim for redemption with new money by the U.S. government.

3.   The suitcase of mutilated currency now is in BEP's official possession as an agency of the U.S. federal government.

-1-

It physically is located in Washington, D.C., being kept separate and distinct from any other item. Examination of the currency in the suitcase has shown it to be valued at $100,042.00, but I am applying for a warrant to seize all of the currency in the suitcase, the suitcase itself, and any other contents, regardless of their precise amount or value.

4.   This suitcase, the mutilated currency, and any other contents of the suitcase may be seized because they are subject to forfeiture to the U.S. government under 18 U.S.C. § 492, based on probable cause to believe that they were made, possessed, or used in violation of federal anti-counterfeiting laws against making falsely or altering U.S. currency, which include 18 U.S.C. §§ 471, 472, or 473. Additionally, I base my application for a seizure warrant on probable cause to believe that the suitcase and its contents are property that was involved in a money-laundering crime, or an attempt to commit one, in violation of 18 U.S.C. § 1956(a)(2). I submit that the facts below show that the suitcase and its contents were involved in a scheme to transport, transmit, or transfer a monetary instrument or funds into the United States from a foreign country with the intent to promote specified unlawful activity, that is, violations of the laws against illegally altering U.S. currency, which are codified at 18 U.S.C. §§ 471, 472, or 473. More detailed citations to the laws on altering U.S. currency, money-laundering, and forfeiture are at the end of this affidavit.

II.   <u>AFFIANT'S BACKGROUND</u>.

5. For five years, I have been a sworn federal law enforcement officer, including serving for the past two years as a special agent of the U.S. Secret Service. Before joining the Secret Service, I was a law enforcement officer for three years at

the Treasury Department's Bureau of Engraving and Printing (BEP). I now am assigned to the Secret Service's Washington Field Office. In addition to working on protection of U.S. and foreign political leaders, I am assigned to a special task force that investigates unlawful structuring of financial transactions. My other police duties include investigating money-laundering, the counterfeiting of U.S. and foreign currency, financial fraud schemes, and identity theft. Because I make this affidavit in applying for a seizure warrant, I have not tried to set forth here all of the information known to law enforcement agents about the events described below. What I have set forth below, I know from having observed it personally, read it in official documents, or from learning it through other sworn law enforcement agents.

### III. BACKGROUND INFORMATION.

6.  The Bureau of Engraving and Printing (BEP) is an agency of the U.S. Department of the Treasury. By law, BEP conducts a program through which it will redeem mutilated U.S. currency, essentially taking in heavily damaged cash and replacing it with fresh money. According to an official BEP report:

> Mutilated currency is defined as currency notes which are either not clearly more than 50% of the original note or in a condition that the value is questionable and therefore special examination is required to determine the value. Mutilation can occur through interactions with fire, water, chemicals, and animals . . . . Badly soiled, limp, defaced, torn, or worn notes that are clearly more than 50% of the original note and do not require special examination are not considered mutilated currency and can be redeemed at any bank. [BEP] is allowed, under regulations by the Department of the Treasury, to exchange mutilated currency at face vale as long as either more than 50% of a note identifiable as United States currency is present or *50% or less of a note identifiable as United States currency is present and the method of mutilation and supporting evidence*

> *demonstrate to the satisfaction of the Treasury that the missing portions have been totally destroyed.* Mutilated currency may be mailed or brought personally to the BEP with a letter stating the estimated value and the explanation of how the currency became mutilated. While each case is carefully examined by trained specialists, [BEP's Director] makes the final determination for the settlement of mutilated currency claims.  [Emphasis in original.]

IV. <u>DESCRIPTION OF PROBABLE CAUSE</u>.

7. Shortly after 8:20 a.m., on October 3, 2006, a man and woman presented themselves at the BEP offices on 14th Street, S.W., Washington, D.C.  The two indicated that they wished to take part in BEP's program for redeeming mutilated U.S. currency.  The man identified himself as Mr. Shohikari Itataku, and the woman was introduced as Ms. Xin Shao, Mr. Itataku's daughter.  Ms. Xin acted as a translator for Mr. Itataku during conversations with BEP officials. Mr. Itataku had a blue suitcase, which he gave to BEP employees for the currency redemption program.  Mr. Itataku said that the suitcase contained $100,000 in damaged or mutilated U.S. currency.

8. I have since learned that airline and U.S. government records indicate that Mr. Itataku entered the United States on October 2, 2003, in Atlanta, Georgia, on a Delta Airlines flight, originating at Narita airport in Japan.  When a person brings more than $10,000 in cash into this country from abroad, she or he must file a Report of International Transportation of Currency or Monetary Instruments or "CMIR."  Government records show that Mr. Itataku filed a CMIR for $100,000 when entering this country on October 2, 2006.

9. On October 3, 2006, after Mr. Itataku gave to BEP the suitcase of mutilated currency, he received a formal BEP "Receipt – Hand Deliveries of Currency" document, whose original copy bears

signatures from two BEP officials.  The receipt states: "Receipt is acknowledged of a claim for payment of mutilated United States currency from the claimant named below" [Mr. Itataku] "The claim will be reviewed and payment, if any, made in accordance" with BEP's "statement of conditions regarding the acceptance of mutilated United States currency for redemption."  The form identifies "Shohikari Itataku" as the claimant, states that the amount claimed was $100,000, and gives Mr. Itataku's home address at a specific place in Tokyo, Japan.

    10.  In seeking to take part in the currency redemption program, Mr. Itataku said the currency in the suitcase had been buried for some time inside the suitcase.  Mr. Itataku also said that the currency became mutilated while it was inside the buried suitcase.

    11.  In October 2006, a BEP investigator, Mr. Richard Hattauer, reported that Mr. Itataku's mutilated currency consisted of:

    –10,300 one-dollar notes;
    – 601 two-dollar notes;
    – 1500 five-dollar notes;
    – 1000 ten-dollar notes;
    – 1797 twenty-dollar notes;
    – 100 fifty-dollar notes; and,
    – 301 one-hundred-dollar notes.

This is a total of $100,042.00, which Mr. Itataku claimed for redemption by the U.S. government.

    12.  On November 8, 2006, another Secret Service Agent and I met with BEP officials concerning the mutilated currency in Mr. Itataku's suitcase.  One official was BEP's Manager of Currency Standards, and the other was BEP Investigator Hattauer.  To protect her privacy, I deliberately have left the manager's name out of this affidavit.

-5-

13.  The BEP currency standards manager said that the mutilated currency, which Mr. Itataku had presented for redemption, appeared to have no characteristics of being buried.  Further, when currency notes are buried together they will contain similar textures, wear patterns, and tears, the BEP official told me.  Some or many notes among Mr. Itataku's mutilated currency did not have these similarities, and it appeared that some of the notes were "bleached" with one or more different solutions.  The BEP official believed that this had been done to make the notes appear more as if they had become mutilated by being buried.  As set forth below, a specialized examination and testing of 30 notes randomly selected from Mr. Itataku's mutilated currency found evidence confirming the BEP official's suspicions that the notes had been altered by being bleached and had other characteristics inconsistent with being buried together.

14.  Additionally, I also have learned that the serial numbers of each bill in Mr. Itataku's mutilated currency have been checked.  One of these bills, a $100 note, had serial number "AB 44311678 A."  This is a duplicate of a serial number on a note submitted to BEP for redemption on May 31, 2006.  I have learned that BEP has redeemed already the $100 note submitted on May 31, 2006.  My training and experience tell me that the fact that another part of this note already has been redeemed in a separate submittal to BEP casts into doubt Mr. Itataku's story that his currency had become mutilated by being buried.  It is very hard to understand how another person could possess in May 2006 a redeemable part of a note that Mr. Itataku says was buried at the time.  It is possible that the note submitted in May 2006 for redemption was counterfeit, which would explain the duplicate serial number, but this explanation means that BEP redeemed a counterfeit note, which I

consider to be an unlikely event.

15.   Thereafter, on February 2, 2007, BEP Inv. Hattauer made a random selection of 30 notes from the mutilated currency that Mr. Itataku had submitted for redemption.  BEP's Office of Materials Technology conducted a scientific and forensics analysis of these mutilated banknotes.  BEP has access to bank notes with "control" features, that is, dollar bills of different denominations, which have been in public use for various periods of time.  These can be used to compare with bills submitted for redemption.  The office issued on April 16, 2007, a written "Team Technical Report" describing its examination, testing, and analysis of Mr. Itataku's mutilated currency.

16.   I have read the "Team Technical Report." Further, I have consulted with BEP Investigator Hattauer to get information about the meaning of the tests described in the "Team Technical Report." Based upon what I learned about the report, I can describe some of the test results in non-technical terms. I summarize here several of what I consider to be the report's key points:

- In the report's section on physical observation of the notes, it states that most of the notes caused the observers/analysts to complain of a sore throat, headache, or irritated nose and eyes due to the chemical smell associated with the notes that was unmistakable when working closely with the notes.

- The section of the report entitled, "Comparison to Chemically Treated Notes Study," stated that it appeared that the notes had been washed and that tests suggest that the mutilated notes were washed with typical laundry detergents.  Further, characteristics of Mr. Itataku's mutilated currency, including the chemical odor associated with the notes suggests that the notes were also subjected to another chemical treatment, such as bleach or sodium hydroxide, as well as the detergent.

- In the same vein, the BEP experts have said that the

specific type of special paper used to make U.S. currency does not fluoresce under ultra-violet light.  But, the BEP experts have advised that when this type of paper is washed in a detergent, the detergent will cause the currency paper to fluoresce.  Mr. Itataku's mutilated currency did fluoresce under ultra-violet light, so the BEP experts believe that it was washed in a detergent.

- The BEP experts observed that, on average, the notes in Mr. Itataku's mutilated currency were thicker than regular or "control" notes, but were also smaller in length than "control notes."  According to the BEP experts, this combination of traits can occur when currency notes have been altered to make them falsely appear mutilated.  When currency gets washed, it shrinks, and also thickens because it absorbs water.  When currency notes are abraded or sanded to make them look more worn, the fibers fray, and the paper gets thicker.  Both of these results are based on the attributes of the special paper from which U.S. currency is made.  Such paper should wear thinner under normal use, as the fibers are worn off, but Mr. Itataku's currency instead has thickened, apparently because of the methods used in "prematurely aging" the notes.

- The report also describes tests performed to see if the notes had characteristics that were in keeping with Mr. Itataku's statement that the currency became mutilated by being buried.  The report found that the notes had one characteristic similar to notes used for six months (stiffness), but that the same notes had another characteristic to a degree found in bills that were in use for two years or more (porosity).

- This variation caused the BEP experts to believe that in Mr. Itataku's currency had not been buried – if it had been buried, then the notes should have had characteristics showing them to be same age and not two different ages.  The BEP experts believe that these conflicting characteristics suggest that the notes were altered by being subjected to at least two processes to make them falsely appear to have been buried.

- The report also found that bills in use for two years showed the most wear and tear on the part of the bill

containing the portrait of a President in the middle (in technical terms, "porous"). In contrast, the portraits on Mr. Itataku's mutilated currency showed the least wear and tear (the portraits were the least "porous"). In other words, the bills in Mr. Itataku's mutilated currency had exactly the opposite traits that they should have had, if it were true that the bills had been buried.

17. The BEP Currency Standards specialists believe that the currency Mr. Itataku handed over for redemption did not become mutilated from being buried inside of the suitcase. First the suitcase was in excellent condition and not damaged by being buried in the soil. Among other things, the BEP specialists believe that the currency inside the suitcase was not buried together because the notes have wear and tear patterns that contradict Mr. Itataku's story. The notes lacked characteristics which usually are present on notes that, in fact, had been buried together inside a suitcase. Last, very often when currency notes actually have been bound up and buried, they bond together, and the natural moisture in the paper causes what can be called signs of "natural mutilation." Instead, the notes submitted by Mr. Itataku are separated, and certain characteristics of natural mutilation are not present. Ultimately, the BEP specialists believe that the notes in Mr. Itataku's currency have traits indicating that they were mutilated intentionally, in part by being bathed twice in detergent or bleach-like liquids.

18. At the time that I make this affidavit, the suitcase containing Mr. Itataku's currency, which he gave to the BEP on October 3, 2006, is now located inside a vault within the Examining and Redemption Section of BEP's building at 14th & C Streets, S.W., Washington, D.C. 20228. I also understand that there are no other similar items in this place that might be seized by mistake under the warrant I seek. In addition, if this Court issues a warrant to

seize this property, I personally shall execute it in the presence of BEP officers to ensure that the property identified in the warrant is the only property seized.

### V. APPLICABLE STATUTES AND LAWS.

19.   Title 18, U.S. Code § 471, makes it a crime to make falsely, forge, counterfeit, or alter an obligation or security of the United States, with the intent to defraud.  Similarly, 18 U.S.C. § 472 makes it a crime to pass, utter, publish, or sell a falsely made or altered U.S. obligation or security with the intent to defraud, as well as to bring into the United States with like intent a falsely made or altered U.S. obligation or security. Section 473 makes it a crime to exchange, transfer, or deliver a false or altered U.S. obligation or security with the intent that same be passed, published, or used as true and genuine.

20.   Under 18 U.S.C. § 8, "obligation or other security of the United States" includes all national bank currency, Federal Reserve notes, Federal Reserve bank notes, United States notes, Treasury notes, among other things, issued under any Act of Congress.

21.   Pursuant to 18 U.S.C. § 492, any articles, devices, and other things possessed or used in violation of 18 U.S.C. §§ 471, 472, or 473, shall be forfeited to the United States.

22.   Additionally, 18 U.S.C. § 1956(a)(2) makes it a crime to transport, transmit, or transfer a monetary instrument or funds from a place outside the United States to a place inside the United States with the intent to promote the carrying on of "specified unlawful activity."  When taken together, 18 U.S.C. §§ 1956(c)(7) & 1961(1) make violations of 18 U.S.C. § 471, 472, and 473 "specified unlawful activity."

23.   Based on the foregoing, I submit that the suitcase and its contents are property that was involved in a transaction or

attempted transaction in violation of 18 U.S.C. § 1956, or are property traceable to such a transaction. Civil forfeiture of such property is authorized in 18 U.S.C. § 981(a)(A). Issuance of a warrant to seize property subject to civil forfeiture is authorized by 18 U.S.C. § 981(b).

      VI. **PRAYER FOR ISSUANCE OF SEARCH WARRANT**.

24. Based upon the information recounted in this affidavit, I respectfully request that a warrant issue to seize the suitcase and any and all items in it, whether currency in whatever condition, or any other thing, paper, or document.

      **FURTHER THAN THIS, affiant sayeth not.**

---
**Michael Riedemann, affiant,**
**Special Agent, U.S. Secret Service**
**U.S. Department of Homeland Security**

      **\* \* \* \* \* \***

Subscribed to and sworn before me on this _____
day of January 2008.

---
**UNITED STATES MAGISTRATE JUDGE**